UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                                                     :

ANGELA ISABEL MARROQUIN ALVAREZ,     :

                            :

          Petitioner,         :

                            :

     -v-                            :

                            :

KENNETH GENALO, *in his official capacity as*  :
*New York Field Office Director for U.S.*      :      26-CV-02250 (JAV)
*Immigration and Customs Enforcement*; TODD :
BLANCHE, *in his official capacity as Attorney*  :    OPINION AND ORDER
*General of the United States*; MARKWAYNE  :
MULLIN, *in his official capacity as Secretary of* :
*Homeland Security*; and TODD M. LYONS, *in his* :
*official capacity as Acting Director, U.S.*     :
*Immigration and Customs Enforcement*,[1]    :

                            :

         Respondents.       :

                            :

------------------------------------------------------------------X

JEANNETTE A. VARGAS, United States District Judge:

      On March 18, 2026, Petitioner Angela Isabel Marroquin Alvarez

("Petitioner") filed a petition for writ of habeas corpus under 28 U.S.C. § 2241,

alleging that her confinement is unlawful under the Immigration and Nationality

Act ("INA"), the Trafficking Victims Protection Reauthorization Act ("TVPRA"), and

the Administrative Procedure Act ("APA"), and that it violated her due process

rights under the Fifth Amendment.  ECF No. 1 ("Petition" or "Pet.").  Petitioner

---

[1] "If the defendant in an official capacity suit leaves office, the successor to the office replaces the originally named defendant."  *Tanvir v. Tanzin*, 894 F.3d 449, 459 n.7 (2d Cir. 2018) (citing Fed. R. Civ. P. 25(d)).  Accordingly, pursuant to Rule 25(d), the Clerk of Court is directed to amend the official caption in this case to conform with the caption above.

seeks immediate release or, in the alternative, a bond hearing at which the

Government bears of burden of justifying Petitioner's detention by clear and

convincing evidence.  ECF No. 4 ("Amended Petition" or "Am. Pet."), ¶¶ 1, 5, 6, 77,

90-103.  For the following reasons, the Petition is **GRANTED**.

## BACKGROUND

### A.    Statutory and Regulatory Framework

Congress enacted the Trafficking Victims Protection Act of 2000 ("TVPA") "to

combat trafficking in persons, a contemporary manifestation of slavery whose

victims are predominantly women and children, to ensure just and effective

punishment of traffickers, and to protect their victims."  TVPA, Pub. L. No. 106-386,

§ 102(a), 114 Stat. 1464, 1466 (2000) (codified as amended at 22 U.S.C. § 7101(a)).

Congress has amended and reauthorized the TVPA multiple times in the decades

since.  *Moore v. Rubin*, 160 F.4th 271, 290 (2d Cir. 2025).  One such amendment and

reauthorization occurred when Congress passed the William Wilberforce TVPRA in

2008.  *D.B. v. Cardall*, 826 F.3d 721, 733 (4th Cir. 2016).

"[I]n passing the TVPRA, Congress sought to improve the procedures

governing the treatment of unaccompanied minors."  *Flores v. Sessions*, 862 F.3d

863, 880 (9th Cir. 2017); *accord D.B.*, 826 F.3d at 738 (describing the TVPRA's

"provisions relating to [unaccompanied alien children as] reflect[ing] Congress's

unmistakable desire to protect that vulnerable group").  "The House Report for the

[TVPRA] states that it was intended to 'require[ ] better care and custody of

unaccompanied alien children to be provided by the Department of Health and

Human Services' and to 'improve[ ] procedures for the placement of unaccompanied children in safe and secure settings.'" *Flores*, 862 F.3d at 880 (quoting H.R. Rep. No. 110-430, at 57 (2007)). "As Senator Dianne Feinstein stated during the debate over the passage of the TVPRA, the Act represents an 'important step to protecting unaccompanied alien children, the most vulnerable immigrants,' and to fulfilling our nation's 'special obligation to ensure that these children are treated humanely and fairly.'" *Id.* (quoting 154 Cong. Rec. S10886 (daily ed. Dec. 10, 2008)).

Under the TVPRA, the Department of Health and Human Services ("HHS")—specifically the Office of Refugee Resettlement ("ORR") within HHS—was given responsibility for "the care and custody of all unaccompanied alien children, including responsibility for their detention, where appropriate." 8 U.S.C. § 1232(b)(1); *see* 6 U.S.C. § 279. To facilitate ORR's care and custody of an unaccompanied alien child ("UAC"), the TVPRA requires that, absent exceptional circumstances, "any department or agency of the Federal Government that has an unaccompanied alien child in custody shall transfer the custody of such child to the Secretary of Health and Human Services not later than 72 hours after determining that such child is an unaccompanied alien child." 8 U.S.C. § 1232(b)(3).

Once ORR has custody of a UAC, ORR must "promptly place[ the UAC] in the least restrictive setting that is in the best interest of the child." *Id.* § 1232(c)(2)(A). "In making such placements, the Secretary may consider danger to self, danger to the community, and risk of flight." *Id.* Placement options include placement with care provider facilities and release to "sponsors," who are either the UAC's parents,

guardians, relatives, or individuals designated by the child's parents.  45 C.F.R. § 410.1201; *see also Mendez Ramirez v. Decker*, 612 F. Supp. 3d 200, 206 (S.D.N.Y. 2020) (noting placement options).

ORR must release a UAC to a sponsor if one is available.  *See* 45 C.F.R. § 410.1201.  Following release to an ORR-vetted and approved sponsor, legal custody of the minor passes from ORR to the sponsor.  *Id.* § 410.1001.  But before a UAC can be released from ORR custody, ORR must first make "a determination that the proposed [sponsor] is capable of providing for the child's physical and mental well-being."  8 U.S.C. § 1232(c)(3)(A).  This determination involves several steps, including the identification of sponsors; sponsor application; interviews; evaluation of sponsor suitability, including verification of the sponsor's identity and relationship to the child, background checks, home studies, and post-release planning.  45 C.F.R. § 410.1202.  Over the past year, the time taken to complete this determination has increased dramatically.  *See* ECF No. 27-1, ¶ 7 n.1 ("Since 2025, the time children spend in ORR custody has increased six-fold from one month to now six months." (cleaned up)).

If ORR does not release a UAC to a sponsor, then ORR retains legal custody, but places the UAC with a care provider facility.  *See* 45 C.F.R. § 410.1101.  These facilities "have three security levels."  *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1178 (N.D. Cal. 2017).  "The least restrictive level is a shelter facility, the medium level is a staff-secure facility, and the most restrictive level is a secure facility."  *Id.* "The secure facility is akin to a local juvenile hall—in fact, ORR uses local juvenile

4

halls to house the most dangerous unaccompanied minors, pursuant to contracts with local governments." *Id.*; *see also* 45 C.F.R. § 410.1102; *id.* § 410.1105.

ORR only retains legal custody of an unaccompanied child until they turn 18 years of age. *See* 6 U.S.C. § 279. The TVPRA as originally enacted did not set forth procedures for the treatment of UACs who were still in ORR's legal custody at the time they turned 18. *See* TVPRA § 235. In 2013, Congress amended the TVPRA to address this situation. *See* Violence Against Women Reauthorization Act of 2013, Pub. L. No. 113-4, § 1261(2)(B), 127 Stat. 54, 156 (2013) (codified as amended at 8 U.S.C. § 1232(c)(2)(B)). Under the amended statute, when a UAC in ORR custody turns 18, they are transferred from ORR custody to DHS, specifically ICE, custody. *See* 8 U.S.C. § 1232(c)(2)(B); *Garcia Ramirez v. ICE*, 812 F. Supp. 3d 86, 90 (D.D.C. 2025). These individuals are referred to as "age-outs." *Garcia Ramirez*, 812 F. Supp. 3d at 90.

The TVPRA affords certain protections to age-outs:

> If a minor described in [8 U.S.C. § 1232(c)(2)(A)] reaches 18 years of age and is transferred to the custody of the Secretary of Homeland Security, the Secretary shall consider placement in the least restrictive setting available after taking into account the alien's danger to self, danger to the community, and risk of flight. Such aliens shall be eligible to participate in alternative to detention programs, utilizing a continuum of alternatives based on the alien's need for supervision, which may include placement of the alien with an individual or an organizational sponsor, or in a supervised group home.

5

8 U.S.C. § 1232(c)(2)(B). "Those protections require all persons who have aged out to be considered for placement in the least restrictive setting." *Singh v. Stevens*, No. 26-CV-133, 2026 WL 456489, at *1 (N.D. Ohio Feb. 18, 2026) (collecting cases).

**B.    Factual History**

Petitioner is a citizen of Guatemala. ECF No. 14 ("Finnie Decl."), ¶ 3; ECF No. 20-1 ("Marroquin Alvarez Decl.") at 1. Petitioner alleges that she was raised by her mother and sister, the latter of whom now lives in Rhode Island. Marroquin Alvarez Decl. at 1. Petitioner alleges that, shortly after her seventeenth birthday, she left Guatemala for the United States so that she might be able to complete her education and help support her family. *Id.* at 1-2.

To accomplish this, Petitioner's mother borrowed money to pay individuals to take her to the United States. *Id.* at 1. Petitioner claims that these individuals drove her to a house near the U.S.-Mexico border. *Id.* at 2. The men running the house purportedly used drugs, stole money from Petitioner, and would not let Petitioner leave to buy food. *Id.* at 2. Petitioner attests that, after several days, the man in charge of the house gave Petitioner a fake identification card and told her to use it if she was arrested after crossing the border. *Id.*

On March 27, 2025, Petitioner entered the United States by crossing the southern border. Finnie Decl., ¶ 4. When she was encountered by U.S. Customs and Border Patrol ("CBP") officers near Douglas, Arizona, she presented a fake identification card in the name of Juliana Cruz Ruiz, a citizen of Mexico who was born on June 6, 2002. *See id.*; Marroquin Alvarez Decl. at 2-3; ECF No. 13-1 at 2.

CBP subsequently issued Petitioner an expedited removal order and referred her for criminal prosecution under 8 U.S.C. § 1325(a)(1) under the name of Juliana Cruz Ruiz. Finnie Decl., ¶ 4. On April 7, 2025, she appeared before a judge with approximately 30 other noncitizens, was convicted, and received a sentence of time served. *Id.*; Marroquin Alvarez Decl. at 3. The next day, she was removed from the United States to Mexico. Finnie Decl., ¶ 5.

Petitioner alleges that, upon being expelled from the United States, she called her mother, who directed her to return to the house near the border. Marroquin Alvarez Decl. at 3. She states that she was not allowed to leave the house for a month. *Id.* She claims that, during that time, she saw the man in charge of the house beat and choke another man, at which point she hid in a bathroom. *Id.* According to Petitioner, shortly after telling the men running the house that her mother had no money left, they again took her across the border. *Id.* at 4.

On or about May 16, 2025, CBP officers again encountered Petitioner near Douglas, Arizona. Finnie Decl., ¶ 6; Marroquin Alvarez Decl. at 4; ECF No. 13-1 at 3. ICE reinstated her prior removal order under 8 U.S.C. § 1231(a)(5) and referred her for prosecution under 8 U.S.C. § 1326(a). Finnie Decl., ¶ 7. On June 4, 2025, Petitioner pleaded guilty to improper entry by an alien and she was sentenced to serve 75 days in prison with credit for time served. *Id.*, ¶ 9. Once she served her sentence, ICE officers attempted to remove her to Mexico, but her removal was not effectuated since it was determined she was a minor from Guatemala. *See id.*, ¶ 11.

7

Petitioner and the Government provide conflicting accounts about when Petitioner told government officials that she was not an adult from Mexico, but a minor from Guatemala. According to Petitioner, shortly after being apprehended and processed upon reentering the United States and before she plead guilty on June 4, 2025, she told CBP officers multiple times that she was a minor from Guatemala and not "Julia Cruz," but they either ignored her or threatened her with additional criminal charges. *See* Marroquin Alvarez Decl. at 4. According to the Government, Petitioner revealed for the first time that she was a minor from Guatemala on July 30, 2025. Finnie Decl., ¶ 11. Regardless, on August 1, 2025, the Guatemalan Consulate verified Petitioner's identity, Angela Isabel Marroquin Alvarez, and birthday, March 18, 2008. *Id.*

As Petitioner was at that point confirmed to be a UAC, she was transferred to ORR custody. *Id.*, ¶ 12. From August 2, 2025, to March 9, 2026, she resided at a shelter in Arizona. *Id.*, ¶ 14; ECF No. 20-2, ¶ 8.

On August 2, 2025, ICE served Petitioner a Form I-862, Notice To Appear ("NTA") in person charging Petitioner under 8 U.S.C. § 1182(a)(6)(A)(i) as an inadmissible alien. Finnie Decl., ¶ 15. On August 6, 2025, ICE cancelled the August 2, 2025 NTA pursuant to 8 C.F.R. § 239.2(a)(6) and issued and served a superseding NTA via regular mail in satisfaction of the notice requirement for serving a minor. *Id.*, ¶ 16. On August 7, 2025, ICE filed the NTA with the immigration court in Phoenix, Arizona, thereby commencing removal proceedings against Petitioner. *Id.*, ¶ 17.

On September 5, 2025, Petitioner appeared in Immigration Court with a friend of the court for an initial master calendar hearing. *Id.*, ¶ 20. The case was reset to allow her time to hire counsel. *Id.* Petitioner next appeared in Immigration Court on February 6, 2026. *Id.,* ¶ 22. She represented that she needed more time to obtain documents to file a relief application and for the reunification process with her sister. *Id.* The case was again reset. *Id.*

On December 22, 2025, the Young Center was appointed as Child Advocate for Petitioner. ECF No. 29-1 at 1. On March 9, 2026, Petitioner was transferred to a shelter in New York, the Children's Home of Poughkeepsie. *Id.*, ¶ 23; ECF No. 20-2, ¶ 3. She resided at this shelter until ORR's custody lapsed on her eighteenth birthday on March 18, 2026. *See* Finnie Decl., ¶ 28.

During Petitioner's time in ORR custody, Petitioner's sister went through the sponsor vetting process with ORR. ECF No. 27-1, ¶ 5. As part of that process, Petitioner's sister provided fingerprints for background checks and underwent DNA testing, a home visit was conducted, and she provided proof of income. *Id.* There was not "sufficient time to complete all sponsor vetting requirements," however. ECF No. 29-1 at 2.

As Petitioner's eighteenth birthday approached in mid-March, ICE completed an Age-Out Review Worksheet ("AORW") to determine whether to detain her when she aged out of ORR custody. Finnie Decl., ¶¶ 24-25. As part of that process, on March 11, 2026, ORR provided a Post-18 plan to identify available placements and alternatives to detention ("ATD"). *Id.*, ¶ 26. On March 13, 2026, Petitioner's Child

9

Advocate also submitted a "Best Interests Determination" letter to ICE.  ECF No. 29-1.

On March 17, 2026, an immigration attorney began representing Petitioner. ECF No. 20-2, ¶¶ 1, 10.  That same day, ICE's Juvenile and Family Residential Management Unit ("JFRMU") reviewed the Post-18 plan and filled out parts of the AORW.  Finnie Decl., ¶ 27; *see* ECF No. 13-5 at 1-5.  The FOJC erroneously marked a box on the AORW indicating that Petitioner lacked an attorney or an advocate. *Id.* at 2.

The AORW consists of recommendations from the Field Office Juvenile Coordinator ("FOJC"), his or her supervisor, and the JFRMU's National Juvenile Coordinator ("NJC").  *See* ECF No. 13-5 at 1-5.  According to ICE policy, if the FOJC and his or her supervisor recommend releasing an individual by using ATD or detention in ICE custody, concurrence must be obtained from the JFRMU prior to finalizing that custody determination.  *Id.* at 4.

In Petitioner's case, the FOJC and his supervisor recommended release under an ATD.  *Id.* at 3-4.  To reach this recommendation, the FOJC considered Petitioner's flight risk, the danger she posed to herself, and the danger she posed to the community.  *Id.* at 1-2.  Finding that she was a flight risk but not a danger to herself or the community, he recommended releasing Petitioner to her sponsor and monitoring her though ATD, specifically GPS monitoring.  *Id.* at 1-4.  The FOJC's supervisor concurred.  *Id.* at 4.

The JFRMU's NJC, however, did not concur and instead recommended detention.  *Id.* at 4-5.  He reasoned as follows:

> I do not concur with ATD.  I recommend detention.  Age-out has lied to federal immigration officials in 3 different incidents.  Age-out was removed to Mexico 3 times under different name and DOB.  Age-out also went through the federal 1326 prosecution as an adult and did not reveal her true identity to the court during the process.  While flight risk is generally mitigated by ATD, given her prior history of lying to the officers and to the court (including to the judge), flight risk is very significant for this age-out.  Detention is the least restrictive setting to mitigate this flight risk.

*Id.* at 4.

On March 18, 2026, when Petitioner turned 18, ICE agents arrested Petitioner and took her into custody at 26 Federal Plaza, New York, New York, pursuant to a Warrant for Arrest (I-200).  Finnie Decl., ¶ 28; ECF No. 13-1 at 4; ECF No. 20-2, ¶¶ 10-11.  That same day, an ICE Supervisory Detention and Deportation Officer ("SDDO") completed an INA § 236(a) Initial Custody Determination form wherein he indicated that Petitioner "is subject to § 236(a)" and made an initial custody determination to detain Petitioner.  ECF No. 13-6 at 1-2.

On March 20, 2026, ICE transferred Petitioner to the Delaney Hall Detention Facility in Newark, New Jersey, where she is currently detained.  Finnie Decl., ¶ 29.

## LEGAL STANDARDS

Petitioner brings a petition for a writ of habeas corpus under 28 U.S.C. § 2241, which "authorizes a district court to grant a writ of habeas corpus whenever

a petitioner is 'in custody in violation of the Constitution or laws or treaties of the United States.'" *Wang v. Ashcroft*, 320 F.3d 130, 140 (2d Cir. 2003) (quoting 28 U.S.C. § 2241(c)(3)). Historically, "the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest." *I.N.S. v. St. Cyr*, 533 U.S. 289, 301 (2001). Accordingly, a district court's habeas jurisdiction includes review of challenges to immigration-related detention. *See Demore v. Kim*, 538 U.S. 510, 516-17 (2003); *see also Zadvydas v. Davis*, 533 U.S. 678, 687 (2001) ("the primary federal habeas corpus statute, 28 U.S.C. § 2241, confers jurisdiction upon the federal courts to hear [cases challenging] custody in violation of the Constitution or laws of the United States").

A petitioner under Section 2241 "bears the burden of proving that he is being held contrary to law; and because the habeas proceeding is civil in nature, the petitioner must satisfy his burden of proof by a preponderance of the evidence." *Skaftouros v. United States*, 667 F.3d 144, 158 (2d Cir. 2011) (citing *Parke v. Raley*, 506 U.S. 20, 31 (1992)). Ultimately, the Court must "summarily hear and determine the facts, and dispose of the matter as law and justice require." 28 U.S.C. § 2243.

## DISCUSSION

### A.    Applicability of Section 1225(b)(2)(A)

The Government contends that Petitioner's detention is mandated by 8 U.S.C. § 1225(b)(2)(A).  ECF No. 15 ("Opp'n") at 10-13.  The Court rejects this argument.

Section 1225(b)(2)(A) provides that "in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien *shall* be detained for a proceeding under section 1229a of this title."  8 U.S.C. § 1225(b)(2)(A) (emphasis added).  When detained under this provision, a noncitizen "may be released only if he is paroled 'for urgent humanitarian reasons or significant public benefit' pursuant to 8 U.S.C. § 1182(d)(5)(A)."  *Lopez Benitez v. Francis*, 795 F. Supp. 3d 475, 484 (S.D.N.Y. 2025) (citation omitted).  Accordingly, "[o]ther than this limited exception[,] detention under § 1225(b)(2) is considered mandatory."  *Id.*

The Government argues that Petitioner meets the definition of an "alien seeking admission" who is not "clearly and beyond a doubt entitled to be admitted," as she twice entered the United States without inspection.  Opp'n at 11-12.  The Government further points out that Petitioner has continuously been in federal custody since being found crossing the border, so this case does not raise the legal questions presented when ICE seeks to detain an alien pursuant to Section 1225(b)(2) after they are paroled and permitted to reside in the United States.  *See,*

*e.g.*, *Barbosa da Cunha v. Freden*, No. 25-3141-PR, 2026 WL 1146044, at \*2-5 (2d Cir. Apr. 28, 2026).

Yet Section 1232(c)(2)(B) confers protections upon UACs who reach 18 years of age while in ORR custody and are transferred to ICE custody. *See* 8 U.S.C. § 1232(c)(2)(B). There is no dispute that, since Petitioner was a UAC in ORR custody who, upon turning 18, was transferred to ICE custody, she falls within the ambit of Section 1232(c)(2)(B). Section 1232(c)(2)(B) requires that an aging-out UAC be considered for placement in the least restrictive setting available, including release to a sponsor or an alternative to detention.

Section 1225(b)(2)(A)'s mandatory detention requirement is thus directly in conflict with the procedural protections conferred by Section 1232(c)(2)(B). Courts across the country, when faced with this question, concur that Section 1225(b)(2)(A) and Section 1232(c)(2)(B) establish "mutually exclusive" detention schemes. *Singh*, 2026 WL 456489, at \*5-7; *see also P.A.H.E. v. Noem*, No. 26-CV-1164 (DJC) (JDP), 2026 WL 451662, at \*1-2 (E.D. Cal. Feb. 17, 2026) ("These statutes are thus plainly incompatible as one mandates detention while the other requires placement in the least restrictive setting and contemplates placement in a variety of release programs."); *R.A.R.R. v. Almodovar*, No. 25-CV-6597 (PKC), 2026 WL 323040, at \*7 (E.D.N.Y. Feb. 6, 2026); *Sandoval v. Rokosky*, No. 25-CV-17229 (SDW), 2025 WL 3204746, at \*2 (D.N.J. Nov. 17, 2025) ("[8 U.S.C. § 1232(c)(2)(B)] is incompatible with § 1225's mandatory detention provision."); *Arevalo Lopez v. Sessions*, No. 18-CV-4189 (RWS), 2018 WL 2932726, at \*13 (S.D.N.Y. June 12, 2018) ("If UACs

14

become 'arriving aliens' on the day they turn eighteen, subjecting them to rearrest and near-indefinite detention, then Section [1232(c)(2)(B)] of the TVPRA would lose the force of law."). A person cannot simultaneously be subject to a mandatory detention provision and a provision that entitles them to mandatory consideration for alternatives to detention. *See F.S.S.M. v. Wofford*, No. 25-CV-1518 (TLN) (AC), 2025 WL 3526671, at \*4 (E.D. Cal. Dec. 9, 2025) ("Petitioner cannot be simultaneously subject to both § 1225(b)(2) and the TVPRA because their detention schemes are facially incompatible.").

Thus, even if an age-out might otherwise meet the statutory criteria for detention under Section 1225(b)(2)(A), to the extent the statutes conflict, the more specific provisions control over the general. *HCSC-Laundry v. United States*, 450 U.S. 1, 6 (1981) ("[I]t is a basic principle of statutory construction that a specific statute . . . controls over a general provision . . . particularly when the two are interrelated and closely positioned."); *accord RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645-46 (2012). Through Section 1232, "Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions." *D.B.*, 826 F.3d at 735. Since "Section 1232(c)(2)(B) is a specific provision applying to a very specific situation," *Garcia Ramirez*, 812 F. Supp. 3d at 103 (quoting *Morton v. Mancari*, 417 U.S. 535, 550-51 (1974)), it governs Petitioner's custody.

The Government is unable to persuasively reconcile Section 1232(c)(2)(B)'s procedural protections and Section 1225(b)(2)(A)'s mandatory detention scheme.

15

The Government maintains that the TVPRA does not apply at all to an individual who has turned 18 years old. Opp'n at 2, 7 (arguing that Section 1232(c)(2)(B) "does not provide for continued protection beyond age-out," and that "a UAC who has reached the age of eighteen is 'no longer a UAC' and 'is not eligible to receive legal protections limited to UACs under the relevant sections of the Act'" (quoting 8 C.F.R. § 236.3(d)(2))). The Government reads Section 1232(c)(2)(B) to provide "for a one-time determination of danger or flight risk prior to transfer into ICE custody." *Id.* at 2. In other words, under the Government's interpretation, the TVPRA to require ICE to perform its mandatory assessment as a precondition to the transfer of custody from ORR to ICE. *Id.* at 13 ("Under the TVPRA, once a minor under ORR custody [turns 18], *and before they are transferred into ICE custody*, they are entitled to a determination of what is the least restrictive setting for that individual." (emphasis added)). If ICE does determine that the age-out should be detained, then "custody [is] properly transferred from ORR to ICE." *Id.* Implicit in the Government's position is that, if ICE determines that placement should be with a sponsor, then custody would not transfer to ICE.

The Government's interpretation is directly contrary to the statutory text. ICE's obligations are triggered only "if [the UAC] reaches 18 years of age and is transferred to the custody of the Secretary of Homeland Security." 8 U.S.C. § 1232(c)(2)(B). Section 1232(c)(2)(B) thus applies explicitly to former UACs who have turned 18 years of age. *See Arevalo Lopez*, 2018 WL 2932726, at *18 ("Under the amended TVPRA, Lopez fits the statutorily defined group of immigrant

16

children-turned-adults to whom Congress granted additional procedural safeguards.").

Moreover, the statute does not precondition transfer to ICE custody on the outcome of the Secretary's detention determination. Grammatically, the consideration of least restrictive placement required by the statute only occurs once the conditional requirements of the antecedent clause are met—that is, when the UAC reaches the age of 18 and custody is transferred.

Any other reading of the statute would lead to absurdities. For example, if ICE does not have legal custody of an age-out whom ICE assesses should be released to a sponsor, but custody instead still resides with ORR, under what authority would ICE act in making a release decision? Moreover, the Government's position does not address the implications of its arguments for those whom ICE determines should be appropriately placed in an ATD program. Such individuals would presumably also transfer to ICE custody upon turning 18 years of age. Yet the Government does not explain how such persons could participate in an ATD program if they are simultaneously subject to mandatory detention pursuant to Section 1225(b)(2)(A).

Accordingly, the relevant statute for assessing the legality of Petitioner's detention is Section 1232(c)(2)(B).

## B.      Judicial Review of Placement Decisions Under Section 1232(c)(2)(B)

Having found that Petitioner's detention is not authorized by Section 1225(b)(2)(A), the Court turns to whether her detention is lawful under Section

17

1232(c)(2)(B).  As a threshold matter, however, the Court must first ascertain whether, and to what extent, it has jurisdiction to review detention determinations made under Section 1232(c)(2)(B).  The Government contends that 8 U.S.C. § 1252(a)(2)(B) strips the Court of jurisdiction to review ICE's placement decision under Section 1232(c)(2)(B).  ECF No. 28 at 1.  While the Government acknowledges that the Court has jurisdiction to review whether ICE's decisionmaking process complied with the procedural protections of Section 1232(c)(2)(B), it asserts that the substance of ICE's decision to detain Petitioner is discretionary, thereby insulating it from judicial review.  *Id.* at 1-2.

The Court has not been stripped of jurisdiction to review ICE's placement decision.  This conclusion follows from an adherence to well-established principles of statutory construction and an examination of Section 1232(c)(2)(B)'s plain language.

Section 1252(a)(2)(B), provides:

> Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, and except as provided in subparagraph (D), and regardless of whether the judgment, decision, or action is made in removal proceedings, no court shall have jurisdiction to review—
>
> (i) any judgment regarding the granting of relief under section 1182(h), 1182(i), 1229b, 1229c, or 1255 of this title, or
>
> (ii) any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland

> Security, other than the granting of relief under
> section 1158(a) of this title.

8 U.S.C. § 1252(a)(2)(B)(i)-(ii).

Any analysis of a jurisdiction-stripping statute must start with "a familiar principle of statutory construction:  the presumption favoring judicial review of administrative action."  *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 229 (2020) (cleaned up).  Under that presumption, "when a statutory provision is reasonably susceptible to divergent interpretation, [courts] adopt the reading that accords with traditional understandings and basic principles:  that executive determinations generally are subject to judicial review."  *Id.* (cleaned up).  This presumption of reviewability applies equally in the immigration context.  *Id.*

This presumption, however, is rebuttable.  *Mach Mining, LLC v. E.E.O.C.*, 575 U.S. 480, 486 (2015).  "It fails when a statute's language or structure demonstrates that Congress wanted an agency to police its own conduct."  *Id.*  "But the agency bears a heavy burden in attempting to show that Congress prohibited all judicial review of the agency's compliance with a legislative mandate."  *Id.* (cleaned up).

The Government urges that Section 1252(a)(2)(B)(ii) divests the Court of jurisdiction to adjudicate this habeas petition to the extent Petitioner seeks review of ICE's placement decision.  Yet Section 1252(a)(2)(B)(ii) strips jurisdiction only of those decisions "specified under this subchapter to be in the discretion of the . . . Secretary of Homeland Security."  8 U.S.C. § 1252(a)(2)(B)(ii).  Since the phrase "this subchapter" refers to "subchapter II of Chapter 12 of Title 8 of the United

19

States Code, which includes §§ 1151–1381," *Sanusi v. Gonzales*, 445 F.3d 193, 198 (2d Cir. 2006), and Section 1252(a)(2)(B)(ii) is situated in that subchapter, the Court's inquiry turns on determining whether the authority for the decision referenced in Section 1232(c)(2)(B) "is specified . . . to be in the discretion of the . . . Secretary of Homeland Security," 8 U.S.C. § 1252(a)(2)(B)(ii).

"The jurisdiction-stripping language of § 1252(a)(2)(B)(ii) applies not to all decisions the [Secretary] is entitled to make, but to a narrower category of decisions where Congress has taken the additional step to specify that the sole authority for the action is in the [Secretary's] discretion." *Alaka v. Att'y Gen. of United States*, 456 F.3d 88, 95-96 (3d Cir. 2006). Authority is discretionary where "the right or power to act is entirely within his or her judgment or conscience," and not "guided by legal standards." *Spencer Enters., Inc. v. United States*, 345 F.3d 683, 690 (9th Cir. 2003); *cf. Afr. Communities Together v. Lyons*, 799 F. Supp. 3d 362, 386 (S.D.N.Y. 2025) ("If the word 'discretion' means anything in a statutory or administrative grant of power, it means that the recipient must exercise his authority according to his own understanding and conscience." (quoting *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 266-67 (1954)). "Put another way, the [Secretary's] general authority to arrive at an outcome through the application of law to facts is distinct from the issue of whether Congress has 'specified' that the decision lies in the Attorney General's discretion and is thus unreviewable." *Alaka*, 456 F.3d at 95-96.

Additionally, in this Circuit, a statutory provision must contain explicit language conferring discretionary authority upon the Secretary before the requirements of Section 1252(a)(2)(B)(ii) will be deemed to have been met.  "When a statute authorizes the Secretary to make a determination, but lacks additional language specifically rendering that determination to be within his discretion (*e.g.*, "in the discretion of the Secretary," "to the satisfaction of the Secretary," etc.), the decision is not one that is 'specified . . . to be in the discretion of the Secretary' for purposes of § 1252(a)(2)(B)(ii)."  *Nethagani v. Mukasey*, 532 F.3d 150, 154-55 (2d Cir. 2008) (cleaned up).

Section 1232(c)(2)(B) does not contain any such language.  It does not expressly specify that the placement decision is "in the discretion of" or "to the satisfaction of" the Secretary of Homeland Security.  The provision also lacks the word "may," which "customarily connotes discretion."  *Jama v. ICE,* 543 U.S. 335, 346 (2005).  These omissions stand in stark contrast to the language of other provisions situated in the same subchapter.  *Compare* 8 U.S.C. § 1232(c)(2)(B), *with, e.g., id.* § 1157(c)(1) ("the Attorney General may, in the Attorney General's discretion[,] admit any refugee" subject to certain conditions), *and id.* § 1182(a)(3)(D)(iii) ("Clause (i) shall not apply . . . if the alien establishes . . . to the satisfaction of the Attorney General" certain conditions).

To the contrary, Section 1232(c)(2)(B) employs language reflecting nondiscretionary obligations:  DHS "*shall* consider placement in the least restrictive setting" and age-outs "*shall* be eligible to participate in alternative to detention

21

programs." 8 U.S.C. § 1232(c)(2)(B) (emphases added). "[T]he word 'shall' usually creates a mandate, not a liberty, so the verb phrase 'shall [consider]' tells us that [DHS] has some nondiscretionary duty to perform." *Murphy v. Smith*, 583 U.S. 220, 223 (2018).

Section 1232(c)(2)(B) also "features no terms either expressly or impliedly precluding judicial review." *Garcia Ramirez v. ICE*, 338 F. Supp. 3d 1, 37 (D.D.C. 2018). *Compare* 8 U.S.C. § 1232(c)(2)(B), *with, e.g., id.* § 1226(e) ("The Attorney General's discretionary judgment regarding the application of this section shall not be subject to review."). Courts "do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply," *CC/Devas (Mauritius) Ltd. v. Antrix Corp.*, 605 U.S. 223, 234 (2025).

The Supreme Court's analysis of Section 1252(a)(2)(B)(ii) in *Kucana v. Holder*, 558 U.S. 233 (2010), lends further support to the conclusion that the Court has jurisdiction to review a Section 1232(c)(2)(B) placement decision. In *Kucana*, the Supreme Court considered whether Section 1252(a)(2)(B)'s proscription of judicial review applied not only to Attorney General determinations made discretionary by statute, but also to determinations declared discretionary by the Attorney General through regulation. 558 U.S. at 237. Ultimately, the Supreme Court held that Section 1252(a)(2)(B) referred to only statutory, not regulatory, specifications. *Id.* To reach that holding, the Supreme Court considered, *inter alia*, (1) the relationship between clauses (i) and (ii) of Section 1252(a)(2)(B) and (2) the

22

character of the decisions encompassed by those clauses. *See id.* at 246-248. Both of these considerations support the Court's holding.

First, the Supreme Court noted that "[t]he proximity of clauses (i) and (ii), and the words linking them—'any other decision'—suggests that Congress had in mind decisions of the same genre." *Id.* at 246. Accordingly, "[t]he clause (i) enumeration . . . is instructive in determining the meaning of the clause (ii) catchall." *Id.* at 247; *see also Hall Street Associates, L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 586 (2008) ("[W]hen a statute sets out a series of specific items ending with a general term, that general term is confined to covering subjects comparable to the specifics it follows.").

As relevant here, the decisions enumerated in Section 1252(a)(2)(B)(i)—8 U.S.C. §§ 1182(h), 1182(i), 1229b, 1229c, 1255—and the decisions the Supreme Court identified as encompassed by Section 1252(a)(2)(B)(ii) in *Kucana*, 558 U.S. at 248—8 U.S.C. §§ 1157(c)(1), 1181(b), 1182(a)(3)(D)(iii)—all employ one or more of the words "discretion," "may," or "satisfaction" to indicate their discretionary nature. *Id.* §§ 1157(c)(1), 1181(b), 1182(a)(3)(D)(iii), 1182(h), 1182(i)(1), 1229b(a), 1229c(a)(1), 1255(a). As already discussed, however, Section 1232(c)(2)(B) lacks the words "discretion," "may," and "satisfaction." *See id.* § 1232(c)(2)(B). With respect to its plain language, then, Section 1232(c)(2)(B) does not appear to be a "decision[ ] of the same genre" as the other decisions encompassed by Section 1252(a)(2)(B).

Second, the Supreme Court found "significant the character of the decisions Congress enumerated in § 1252(a)(2)(B)(i)," which were "of a like kind" as those

23

"decisions . . . shielded from court oversight by § 1252(a)(2)(B)(ii)." *Kucana*, 558 U.S. at 247-48.  Specifically, the decisions referenced in Section 1252(a)(2)(B)(i) "address[ ] different form[s] of discretionary relief from removal," such as "waivers of inadmissibility," "permission for voluntary departure," and "adjustment of status." *Id.* at 246-48.  The decisions the Supreme Court identified as encompassed by Section 1252(a)(2)(B)(ii) address the Attorney General's "discretion to admit [certain] refugees," "discretion to waive [certain] requirement[s] for readmission," and "discretion to waive . . . inadmissibility" in certain circumstances. *Id.* at 248. In other words, these decisions concern "the Executive['s discretion] to afford [an] alien substantive relief." *Id.*; *see id.* at 247 ("As the Government explained at oral argument, the determinations . . . listed [in Section 1252(a)(2)(B)(i)] are 'substantive decisions . . . made by the Executive in the immigration context as a matter of grace, things that involve whether aliens can stay in the country or not.'").

Section 1232(c)(2)(B) does not confer substantive relief for an age-out.  In the immigration context, substantive relief typically refers to forms of relief that determine whether a noncitizen may remain in the United States or obtain lawful status. *See, e.g.*, *id.* at 246-48.  Section 1232(c)(2)(B), by contrast, does not prevent removal or confer lawful status, but simply governs whether and how the age-out is detained during removal proceedings.  Accordingly, Section 1232(c)(2)(B)'s character is not "of a like kind" to the decisions enumerated in Section 1252(a)(2)(B)(i) or identified by the Supreme Court as encompassed by Section 1252(a)(2)(B)(ii).

24

Section 1232(c)(2)(B) therefore does not fall within the purview of Section 1252(a)(2)(B)(ii).

The Court notes that at least one district court has reached a contrary conclusion regarding its jurisdiction to review placement decisions under Section 1232(c)(2)(B). In *Rodas Godinez v. ICE*, the district court held that Section 1232(c)(2)(B) is discretionary within the meaning of Section 1252(a)(2)(B)(ii). No. 20-CV-466 (KWR) (SMV), 2020 WL 3402059, at *4 (D.N.M. June 19, 2020). In so ruling, the district court noted that "the Tenth Circuit does not require the use of the word 'discretion' and will infer discretion when it arises from the statutory text." *Id.* Applying that standard, the district court contrasted the "shall consider" language of Section 1232(c)(2)(B) with Section 1232(c)(2)(A), the provision pertaining to placement determinations for minors in ORR custody. *Id.* The latter section provides that UACs "shall be promptly placed in the least restrictive setting that is in the best interest of the child." 8 U.S.C. § 1232(c)(2)(A). The district court therefore interpreted the "phrase 'shall consider placement in the least restrictive setting' [to] clearly impart[ ] discretion on the Secretary in deciding where to place age-outs." *Rodas Godinez*, 2020 WL 3402059, at *4.

The Court does not find this reasoning persuasive. The Second Circuit requires more explicit language before it will infer Congressional intent to deprive courts of jurisdiction to review agency action. *See Nethagani*, 532 F.3d at 154. This is true even if the underlying decision permits the exercise of a degree of discretion by the agency. *Id.* ("The question is not whether these inquiries require an exercise

25

of discretion.  They probably do.  We must also determine whether the text of the subchapter in which they appear 'specifie[s]' that the 'decision' is 'in the discretion of the Attorney General.'"); *see also Ruiz v. Mukasey*, 552 F.3d 269, 275-76 (2d Cir. 2009) (holding that district courts have jurisdiction to review the Attorney General's "determinations" as to whether the facts alleged in a petition are true and whether an alien meets the legal definition of "immediate relative" within the meaning of 8 U.S.C. § 1154(b), because the statute did not "contain additional language specifically rendering these determinations to be within the Attorney General's discretion" (cleaned up)).[2]

More fundamentally, however, the ultimate placement decision for an age-out is not left entirely within ICE's judgment or conscience unguided by legal standards.  *See Spencer Enters.*, 345 F.3d at 690.  Rather, the statutory text instructs ICE to "arrive at an outcome through the application of law to facts," *Alaka*, 456 F.3d at 95, specifically a consideration of the risks of danger to self or the community and risk of flight.  The repeated use of the word "shall" in Section 1232(c)(2)(B) speaks to the mandatory nature of the age-out procedures.  If the Government is correct and its decision is wholly discretionary, it could theoretically

---

[2] The district court in *Garcia Ramirez* also suggested in *dicta* that ICE's detention decisions were not reviewable under Section 1252.  338 F. Supp. 3d at 39.  In that case, however, the plaintiffs did not challenge their placement decisions, only the failure of ICE to consider them for alternatives to detention, and thus this question was not litigated.  *Id.*  Judge Contreras agreed that that district court "need not have the authority to review every aspect of DHS's placement decisions to have the authority to review aspects for which there are meaningful standards for judicial review and for which Congress did not preclude such review."  *Id.*

exercise its unreviewable discretion to place an age-out in detention even if there was no risk of danger or flight, so long as it engaged in the mandatory "consideration." Nothing in the statute suggests that the ultimate placement decision can be made in disregard of the specific factors that Congress requires ICE to "take into account," however. In the analogous context of the Administrative Procedures Act, for example, which prohibits review of actions "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), courts "routinely" review claims that an "agency did not appropriately consider all of the relevant factors that the statute sets forth to guide the agency in the exercise of its discretion," *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 25 (2018). Section 1232(c)(2)(B) thus provides sufficient standards by which the Court can assess whether ICE's decisionmaking comported with its statutory obligations.

## C.    Violations of the TVPRA

Having discussed the requirements of Section 1232(c)(2)(B) and established that the Court has jurisdiction to review whether ICE complied with the TVPRA in rendering its placement decision, the Court turns to the merits of Petitioner's habeas petition. A close examination of the record leads the Court to find that ICE officials violated Section 1232(c)(2)(B) in the course of ordering her detention. Accordingly, Petitioner is entitled to relief on her habeas petition.

The standard of review the Court should apply when determining whether ICE violated Section 1232 is unclear, and the parties' supplemental briefs have offered little clarifying authority in this respect. *See* ECF No. 28 at 2-3; ECF No. 29

27

at 2-4.  No matter the standard—whether it is substantial evidence, *see, e.g., Singh v. Garland*, 11 F.4th 106, 113 (2d Cir. 2021) ("review[ing] the agency's decision for substantial evidence [requires] defer[ring] to the factfinder's findings based on such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" (cleaned up)); clear error, *see, e.g., Wu Lin v. Lynch*, 813 F.3d 122, 126 (2d Cir. 2016) ("A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (cleaned up)); or abuse of discretion—ICE's placement decision cannot survive review.

ICE's AORW finds that Petitioner did not pose a danger to herself or to the community.  ECF No. 13-5 at 1-2.  Specifically, she was assessed to have no mental health issues, no history of suicide attempts or self-harm, no gang ties, no criminal delinquency history, no terrorist affiliations, and no behavioral issues while with ORR.  *Id.*

With respect to risk of flight, the AORW looks to whether an age-out lacks community or family ties, has a final order of removal, a history of escape attempts, lacks a fixed address, has a pending application for relief, or has a prior immigration history.  *Id.* at 2.  Petitioner was found to have one negative factor, her prior immigration history.  *Id.*

Notably, the instructions on the AORW instruct the reviewer to "consider mitigating flight risk factors, such as an available sponsor.  If the Age-Out presents

28

flight risk concerns that cannot be mitigated by release to a sponsor, consider release pursuant to ICE's ATD Program or release on an ICE bond." *Id.*

Accordingly, the FOJC recommended that, in light of the fact that Petitioner did not pose a risk of danger to herself or the community, release to her sister would be appropriate. *Id.* at 3-4. The FOJC further found that placing Petitioner on a GPS monitor would address the risk of flight posed by Petitioner's previous use of a false identification. *Id.*

The JFRMU's NJC nonetheless determined that detention was appropriate. *Id.* at 4. He found that Petitioner had "lied to federal immigration officials in 3 different incidents" and "was removed to Mexico 3 times under different name and DOB." *Id.* He concluded that "[w]hile flight risk is generally mitigated by ATD, given her prior history of lying to the officers and to the court (including to the judge), flight risk is very significant for this age-out." *Id.*

The agency's factual findings are contradicted or unsupported by the record before the agency. To begin with, the record unmistakably establishes that Petitioner was only removed to Mexico once, not three times. *See* ECF No. 13-1 at 2-4; ECF No. 13-3 at 1-3. There is also scant evidence that Petitioner lied to officials in "three separate incidents." At most, the record indicates Petitioner possessed a false identification card and told a CBP officer "that [she is] a citizen and national of Mexico." *See* ECF No. 13-3 at 3. Although Petitioner was convicted of illegal entry, there is nothing in the record to indicate that Petitioner affirmatively lied to a judge about her identity during those proceedings.

29

In addition, the FOJC who completed the initial portions of the AORW incorrectly checked a box indicating that Petitioner lacked "an attorney or an advocate who is not an attorney." ECF No. 13-5 at 2. While this mistake regarding Petitioner's attorney is understandable, since Petitioner only retained an attorney the same day the AORW was completed, *compare* ECF No. 13-5 at 5, *with* ECF No. 20-2, ¶ 10, the error regarding whether Petitioner had a Child Advocate reveals deficiencies with ICE's internal processes. The Young Center had been Petitioner's Child Advocate since December 22, 2025, and had submitted a "Best Interests Determination" letter to ICE to aid its individualized assessment of Petitioner on March 13, 2026. ECF No. 29-1 at 1. This mistake not only reveals that the FOJC failed to consider the available record, but also highlights that Petitioner's Child Advocate appears to have been effectively excluded from the decisionmaking process.

Finally, the Court is troubled by the lack of explanation in the record for the conclusion that GPS monitoring would not sufficiently ameliorate any risk of flight that may exist. The JFRMU's NJC conceded that the ATD program is generally effective at addressing risk of flight. ECF No. 13-5 at 4. He nonetheless stated, in a conclusory fashion, that it would not suffice here because of Petitioner's prior false statements. *Id.* The connection between those prior false statements and the efficacy of GPS monitoring, however, is not at all apparent. It is also not clear that in making his determination, the JFRMU's NJC adequately considered any other factors that would negate risk of flight, such as the fact that Petitioner would be

30

released to her sister, and thus had family ties in the community; that her sister had been determined to have sufficient financial resources to support her; that she had no history of escape attempts or any behavior issues while in ORR custody; or that she did not yet have a final order of removal pending against her. *Id.*

The Court finds instructive Judge Contreras's thorough construction of the procedural requirements of Section 1232(c)(2)(B), particularly ICE's obligation to consider placing an age-out in the least restrictive setting available:

> It is equally clear to the Court that the consideration of placement in the least restrictive setting available must bear some relation to the risk factors that have been taken into account. [Section 1232(c)(2)(B)] outlines the structure of a single agency decision, with two components to it. . . . [T]he statute calls for an individualized assessment of the proper placement for each former unaccompanied minor in light of DHS's assessment of his or her danger to self, danger to the community, and risk of flight.

*Garcia Ramirez v. ICE*, 471 F. Supp. 3d 88, 177 (D.D.C. 2020) (cleaned up). Section 1232(c)(2)(B) "implicitly proscribes . . . taking the statutory factors into account and detaining automatically based on that accounting." *Id.* at 176. Moreover, Section 1232(c)(2)(B) requires ICE to "evaluat[e] the range of available settings" because ICE "cannot know which setting is least restrictive without knowing the range of alternatives that are available." *Id.* at 178.

Here, there is no indication in the record that ICE meaningfully considered any other alternatives available, from the posting of a bond to home detention, nor did it explain why those alternatives would have been insufficient to mitigate its

31

concerns regarding flight risk. As a result, the Court is left with the definite and firm conviction that ICE's detention decision failed to give the requisite consideration of the factors required by statute. *Cf. Gerber v. Norton*, 294 F.3d 173, 185 (D.C. Cir. 2002) ("[S]tating that a factor was considered—or found—is not a substitute for considering or finding it." (quotation omitted)); *Cent. Vermont Ry., Inc. v. I.C.C.*, 711 F.2d 331, 336 (D.C. Cir. 1983) ("When a statute requires an agency to consider a factor, the agency must reach an express and considered conclusion about the bearing of the factor . . . ." (cleaned up)).

## D.    Relief

Petitioner has established that her detention violates the TVPRA. She is thus entitled to relief with respect to her habeas petition. The question, then, is the appropriate form of relief. Petitioner argues that ICE failed to provide any kind of individualized consideration of her circumstances prior to ordering her detention, such that she should be released without any constraints on her liberty. Pet. at ¶¶ 86-87 (citing cases).

While ICE's age-out process was flawed, the record does not support the conclusion that ICE wholly abdicated its obligation to perform any pre-deprivation consideration of Petitioner's individual circumstances. *See Arevalo Lopez*, 2018 WL 2932726, at *12 (holding release warranted where petitioner, who had been released as a UAC to a sponsor, was detained upon turning 18 years of age without ICE making any finding of dangerousness or flight risk under Section

1232(c)(2)(B)).  Moreover, ICE's finding that Petitioner presents a potential risk of flight has support in the record.

Congress has conferred upon ICE the discretion to determine the least restrictive placement options for an age-out.  ICE has greater familiarity with the range of available placement options, including all potential conditions that can be placed upon Petitioner's release and the various alternative to detention programs. The Court therefore orders ICE to consider appropriate conditions for Petitioner's release sufficient to mitigate any potential risk of flight, consistent with the requirements of Section 1232(c)(2)(B).

**CONCLUSION**

Accordingly, the Petition is **GRANTED**.  The Government is **ORDERED** to release Petitioner from detention by **Tuesday, May 5, 2026, at 5:00 pm**.  ICE may impose conditions upon Petitioner's release, provided that ICE has determined that such conditions are the least restrictive conditions necessary to address any potential risk of flight.  ICE's consideration shall comply with Section 1232(c)(2)(B) of the TVPRA.

The parties shall file a letter to update the Court about Petitioner's status by **May 6, 2026**.

The Clerk of Court is directed to substitute the named defendants in this matter and amend the caption of this case pursuant to Federal Rule of Civil Procedure 25(d), as set forth in footnote 1.  The Clerk of Court is further instructed to enter judgment for Petitioner in accordance with this Opinion and Order, to

33

34

terminate all pending motions, and to close the case.

     SO ORDERED.

Dated:  May 4, 2026
     New York, New York

                       JEANNETTE A. VARGAS
                       United States District Judge

34